IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


UNITED STATES OF AMERICA

v.                                              CASE NO. 4:04-cr-00007-SPM-AK

LALANDA PRICE,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Doc. 108, Motion to Vacate under 28 U.S.C. § 2255,

by Lalanda Price.  Defendant is represented by counsel.  The Government has filed its response,

Doc. 114, and Defendant has filed his reply.  Doc. 115.  As it began its review, the Court

determined that an evidentiary hearing was necessary, primarily because it believed that the

credibility of counsel and Defendant might be at issue.  Doc. 125.  Accordingly, the Court

scheduled a hearing on Defendant's motion, which was held on November 13, 2008.  This cause

is therefore in a posture for decision.  Having carefully considered the matter, the Court

recommends that the motion to vacate be granted.

## BACKGROUND

The defendant, Lalanda Price, and a co-defendant, Ronald Allen, were indicted for

conspiracy to distribute and to possess with intent to distribute more than 50 grams of crack

cocaine and for possession with intent to distribute more than 50 grams of crack cocaine.  Doc.

1.  Subsequently, the Government filed an Information and Notice of Prior Conviction, advising

Price of its intention to seek an enhanced sentence of not less than 20 years imprisonment based

on his prior felony conviction for sale of cocaine.  Doc. 26.  Thereafter, the co-defendant Allen

pled guilt and agreed to cooperate.  Doc. 42.

A week before trial, on May 10, 2004, the Government submitted its witness list, which included as proposed testifying witnesses, the co-defendant, Allen; the informant, Regina McFadden; and "Ciji Perry."  Doc. 43.  According to the certificate of service, the list was "furnished electronically" to Price's retained counsel, Richard Greenberg, on that date.  *Id*.  An amended list which still included Perry's name was filed the next day.  Doc. 44.  It too, according to the certificate of service, was furnished to Mr. Greenberg electronically on the date of filing.  *Id*.

On the day of trial, May 17, 2004, Defendant appeared in court with Greenberg  and announced that he wished to enter a plea of guilty to both counts of the Indictment.  At that time, the Court engaged in a colloquy with him.  After Price was sworn, the Court advised him of his rights.  Doc. 75 at 6-7.  When Defendant, who was a college student and a member of the Army Reserves at the time, indicated that he did not "exactly" understand those rights, the Court reiterated them, one by one:

> THE COURT: Let me go over it again with you.  We'll take it one at a time.
>
> You have the right to a trial by a jury.  And to have that jury determine your guilt or innocence.  You understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You have the right to be represented by a lawyer at trial, as well as every other stage of this case.  And if you cannot afford to hire a lawyer on your own, you have the right to be represented by a court appointed lawyer without any cost to you.  You understand that right?
>
> THE DEFENDANT: Yes.

THE COURT:            You have the right to confront witnesses, that is to see, hear, and cross-examine any witness testifying against you. You understand that?

THE DEFENDANT: Yes.

THE COURT:            You also have the right to testify and present evidence on your own behalf if you would like to. You understand that?

THE DEFENDANT: Yes.

THE COURT:            You have the right to compel attendance of witnesses; that is, we can subpoena those witnesses in here and have those witnesses present and testify on you behalf at any trial. You understand that?

THE DEFENDANT: Yes.

THE COURT:            You have the right to persist in your prior plea of not guilty, and if you do so, the government will have the burden or duty of proving your guilt to a jury by a standard of proof known as beyond a reasonable doubt. You understand that?

THE DEFENDANT: Yes.

THE COURT:            There is no burden on you to prove your innocence because the law presumes that you are innocent until proven guilty. You understand that?

THE DEFENDANT: Yes.

THE COURT:            However, if your plea of guilty is accepted here today, you waive or give up each of the rights I've just explained to you. Now knowing that you give up each of the rights by pleading guilty, is it your intent to plead guilty here today?

THE DEFENDANT: Yes.

*Id*. at 7-9.  The Court further advised Defendant:

THE COURT:            If your plea of guilty is accepted by me, you waive or give

> up any defense you may have to the charges....You
> understand that?

THE DEFENDANT:  Yes.

*Id*. at 9.

The Government then advised the Court of the evidence it "would have been prepared to prove" if the case had gone to trial.  *Id*. at 11.  Included in the Government's recitation were statements by the co-defendant Allen that he was the sole owner of the cocaine recovered from the Nissan Sentra in which Price was a passenger, that Price "knew the crack cocaine was inside the vehicle," and that he "was trying to protect his cousin, Defendant Price, after...the indictment was rendered."  *Id*. at 12-13.  The Government also intended to offer Price's post-Miranda statements that Allen

> called him for a ride...so that he could meet the source.  He also stated that...Allen
> told him that he was taking cocaine to the source....
>
> Defendant Price also stated that he believed there were two ounces of cocaine
> inside the box.  He also admitted that Defendant Allen would likely give him a
> little spending money.
>
> Evidence would also show that...Price arranged transportation for...Allen to travel
> to Pompano, which is where the drugs were obtained from.
>
> Further evidence will show that...Price wrote a personal check from his checking
> account...in the amount of $1,400.  The check was written and given to...Allen so
> that...Allen would not have to travel to Pompano with such a large amount of
> cash.

*Id*. at 13.

When the Court questioned Defendant as to whether those facts were true and correct, Defendant said, "Not exactly," and then explained:

> It's the fact of the matter is that my cousin did call me to give him a ride to the
> mall.  He did not tell me he was taking cocaine to this young lady.

I mean at some point, you know, while we was there, I did ask him, "What is going on?" He told me what was going on. That's why I told the police officers what he told me was going on, you know? So, I mean he wasn't being straight up with me, and I did open that box. And when I was fully aware of what was really going on, I wanted to remove myself from that situation, but at the same time I didn't act immediately, as I should have, and I stand here today.

\* \* \*

[The $1,400 check] came from way back when he went to jail, back in November of 2002. I was trying to help him bond out of jail. It wasn't my money. It was money that his girlfriend had given....

He found out that he couldn't bond out of jail. He knew...that I was behind on this rent. He told me that I could use that money to do what I needed to do....[W]hen he got out of jail here, he started looking for me....

\* \* \*

He basically wanted the money back....I knew I was coming home soon [from overseas], but at the same time I didn't want to be dealing with the dude.

\* \* \*

I wasn't trying to come back to, you know, and make myself subject to what I got in trouble to before.

\* \* \*

I never see my cousin handling no cocaine. Only thing I ever seen him touch was marijuana. I've never seen my cousin deal with no cocaine. But at the same time, I know what I'm here for–I know my purpose in life, and dealing drugs, that's not my purpose in life. I didn't want to be with him. I didn't want him bothering me and nagging me and dealing with him the way it was before I left to go overseas. But I did owe that to him....I did feel the obligation to eventually call him and repay that debt to him, and I did that. So that's what it is, sir.

*Id*. at 14-17.

The Court then questioned Defendant:

THE COURT:        You've discussed this matter with your attorney?

THE DEFENDANT: I have.

THE COURT:  And did you counsel with him as to whether it's in your best interest to enter a plea here today?

THE DEFENDANT:  I have.

THE COURT:  And did you consider it to be in your best interest to enter a plea here today?

THE DEFENDANT:  I mean...he's talked to me, and it basically–I just don't know what to say about my cousin.

THE COURT:  Well, let's talk about you.  Do you consider it to be in your best interest to enter a plea here today?

Apparently with my discussions with your lawyer and with the assistant United States Attorney is that you orally agreed to enter into a plea and cooperation agreement, is that correct?

THE DEFENDANT:  I have.

THE COURT:  And in that agreement you would be involved in cooperating with the government in other matters that may involve criminal activity by other persons, is that correct?

THE DEFENDANT:  I have.

THE COURT:  And in regard to that, if...your cooperation rose to the level of substantial assistance, the government could file a motion that would allow me to go below the sentencing guidelines.  You've talked to Mr. Greenberg about that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And is that what you decided to do before we started this proceeding about 45 minutes ago?

THE DEFENDANT:  Yes, I did.

THE COURT:  Are you still willing to go along with that agreement you reached with the government, or have you changed your mind?

* * *

THE DEFENDANT: I'm going to do it, sir.  I need to do that.

THE COURT: You understand that you have the right to go to trial and a jury will decide whether you would be found guilty or not guilty?

* * *

THE DEFENDANT: I do understand that.

* * *

THE COURT: Well, let's go forward then.

*Id*. at 17-19.

The Court then asked counsel for Defendant and for the Government to state the substance of the plea agreement:

MR. GREENBERG: Your Honor, it's the standard plea and cooperation agreement utilized by the U.S. Attorney's Office for the Northern District of Florida; that if Mr. Price provides what is deemed to be substantial assistance in the sole discretion of the U.S. Attorney's Office, that they would then file a certificate of assistance under rule 5K1.1 of the sentencing guidelines.

* * *

MS. NESMITH: Yes, Your Honor, that is the general substance of the agreement.  I would like to put on the record that the U.S. Attorney's Office decides on whether or not a substantial assistance motion is filed, and that we do not agree to recommend or be bound to any specific sentence.

* * *

THE COURT: Mr. Price, is that your understanding of the agreement you've entered into?

THE DEFENDANT: Yes.

*Id*. at 21-22.

The Court then questioned Defendant regarding whether any promises had been made to

him and whether he was satisfied with the services of Mr. Greenberg:

> THE COURT:               Mr. Price has anyone made any promises other than what's
> set forth here on the record?
>
> THE DEFENDANT:  No, sir.
>
> THE COURT:               Has any person used any threats, force, violence to make
> you come in here and plead guilty today?
>
> THE DEFENDANT:  No, sir.
>
> THE COURT:               Now you've been represented in these proceedings by Mr.
> Greenberg....Have you had sufficient time to discuss your
> case fully with your lawyer?
>
> THE DEFENDANT:  Yes, I have, sir.
>
> THE COURT:               Are you satisfied with your lawyer and the way he
> represented you in this case?
>
> THE DEFENDANT:  Extremely.
>
>                             * * *
>
> THE COURT:               Do you have any complaint whatsoever about the way Mr.
> Greenberg or anyone from his office has represented you?
>
> THE DEFENDANT:  No, sir.

*Id*. at 23-24.

The Court then found (1) that Defendant was "alert and intelligent," (2) that he

understood "the nature of the charges against [him] and that he appreciate[d] the consequences

of pleading guilty," (3) that the "facts which the government is prepared to prove...are true and

sufficient to sustain [the] plea of guilty," (4) that Price was "fully aware of the effect of the

sentencing guidelines...and the possible sentence or punishment that may be imposed," and (5) that Defendant's decision to plead guilty was "freely and voluntarily made and that [he had] made [his] decision with the advice and counsel of a competent lawyer with whom...[he was] well pleased." *Id*. at 24. When asked how he pled to the two counts of the Indictment, Price unequivocally stated: "I plead guilty, sir." *Id*.

Because the change of plea was tendered on the day of trial, the written Plea and Cooperation Agreement was not ready, and therefore, it was not signed and filed until three days later. Doc. 46. The substance of the Agreement was the same as had been represented at the plea hearing.

Shortly thereafter, the Government filed a motion for 5K1.1 relief on behalf of Defendant Allen in part because he had "advised that [Price] arranged transportation for [him] to travel to Pompano, Florida to purchase the crack cocaine and issued a check in the amount of $1400 to Defendant Allen in exchange for cash for the purchase of the crack cocaine." Doc. 51. He was consequently sentenced to 170 months, rather than the mandatory minimum life sentence he was otherwise facing. Doc. 54.

Defendant filed one objection to the Presentence Report regarding a four-point adjustment for his alleged minimal participation in the offense. Doc. 56. According to the objection, "Defendant's participation in this offense was limited to driving his co-defendant, Ronald Allen, to the Tallahassee Mall for what turned out to be the delivery of cocaine. Defendant did not become involved in this case in any way until less than one hour before his arrest." *Id*.

On October 18, 2004, Defendant appeared for sentencing and made an *ore tenus* motion

to withdraw his guilty plea, and sentencing was continued.  Doc. 68.  Thereafter, Price filed a

written motion to withdraw his plea.  Doc. 71.  In his motion, he advised the Court that he had

"been attempting to cooperate with government agents in order to earn a 5K1.1 certification from

the government" but that his "efforts have been unsuccessful in part due to the failure of law

enforcement agents to pursue leads and other information provided by Defendant."  *Id*.  He also

stated that based on a letter from the Government, he was under the impression that if he could

arrange for third-party cooperation, he might be eligible for a substantial assistance motion.  *Id*.

According to Price, he did not learn until October 18, 2004, "that third-party cooperation would

not be accepted in this case," and that if he had been aware that third-party cooperation could not

result in a substantial assistance motion, he "would not have pled guilty."  *Id*.  Defendant also

claimed that on that same date, he was "provided for the first time with a DEA-6 report of an

interview conducted with Defendant's co-defendant and Government witness, Ronald Allen,

which stated that Allen "told law enforcement agents that Defendant agreed to obtain a vehicle

from a woman named Ciji Perry for Mr. Allen to use to drive to Pompano Beach, Florida, to

obtain cocaine."  *Id*.  Mr. Greenberg then spoke with Ms. Perry, who advised him that "she has

not had contact with Defendant since 2002," and that "she would never loan her car to anyone."

*Id.*

The Government opposed the motion, pointing out that although there had been

discussions regarding Defendant's personal cooperation and third-party cooperation, nothing

developed on either front rising to the level of substantial assistance.  Doc. 72.  It also rejected

his argument that he needed to follow up "with information provided by co-defendant Ronald

Allen which may be contradicted by Ciji Perry," pointing out that "Mr. Greenberg met with co-

defendant Ronald Allen prior to trial and had ample opportunity to follow up with Ciji Perry for

possible impeachment evidence, if he so desired prior to the Defendant's entry of plea." *Id*. The

Government then directed the Court to other "significant...evidence proving the Defendant's

guilt...." *Id*.

> In reply, Defendant stated:
>
> The Defendant was not aware that Ms. Perry was a possible government witness
> until October 18, 2004, when Defendant was provided for the first time with a
> DEA-6 report of an interview conducted with Defendant's co-defendant and
> Government witness, Ronald Allen, stating Mr. Allen told law enforcement
> agents that Defendant agreed to obtain a vehicle from Ciji Perry for Mr. Allen to
> use to drive to Pompano Beach, Florida, to obtain cocaine.

Doc. 76. According to Defendant, when Mr. Greenberg interviewed Allen in April, 2004, "Mr.

Allen never mentioned anything...about Ciji Perry or borrowing a car to drive to Pompano." *Id*.

Mr. Greenberg further explained:

> While the Government may have listed Ms. Perry on the witness list filed May
> 10, 2004, and the amended witness list filed May 11, 2004, the undersigned
> counsel did not review these documents and, thus, Defendant was not aware that
> Ms. Perry was on the witness list. On May 10, 2004, the undersigned counsel
> was in Stuart, Florida. Upon returning to Tallahassee, the undersigned spent a
> great deal of time preparing for a number of hearings to be held before the Florida
> Board of Bar Examiners on May 13-15. During this week, the undersigned
> counsel received [six] faxes from the U.S. Attorney's Office, none of which
> mentioned Ciji Perry....

*Id*.

The Court denied the motion, finding "no indication that counsel's performance has been

deficient in any way" and that "Defendant's plea was knowing and voluntary." Doc. 77.

On November 29, 2004, Defendant appeared again for sentencing, and he addressed the

Court:

> I apologize for my actions. I take responsibility for my actions....

* * *

And this situation here...still today is hard for me to explain because I know that I wasn't there for the purpose that's been said that I was there. I know that for a fact. But I can't blame anybody for that because I put myself there.

Doc. 96 at 9. The Court then gave Mr. Greenberg the opportunity to address any remaining issues, including Defendant's role in the crimes charged:

I guess I recognize the Court has already ruled on the motion to withdraw the plea....But I would ask the court to consider the possibility of granting the motion as–basically, if Mr. Price is going to be sentenced to a 20-year minimum mandatory sentence, it certainly seems fair and just that a jury would find him guilty before he's sentenced to that offense. I just wanted to make that statement.

But in regard to the objection, as I said, from everything that I have seen in this entire case, Mr. Price had a very minimal role. He drove Ronald Allen from an apartment to the Tallahassee Mall where the drug transaction took place. And I recognize that there's allegations that Mr. Price gave Mr. Allen money to go to Pompano Beach to buy cocaine to come back to Tallahassee. At the same time, Mr. Allen gave a statement where he said that he bought the cocaine here in Tallahassee from a person named Black on the south side of town.

So if you look at the conduct which occurred in this case, which was driving Ronald Allen to the Tallahassee Mall for, according to the...statements that were made–for spending money or gas money, I submit that that is a minor role in this case.

*Id*. at 12.

The Court overruled the objection to Defendant's role, stating:

[D]efendant has been held accountable only for his actual conduct. That conduct includes providing a check in the amount of $1400 to codefendant Allen so that Allen would not be required to travel with cash to Pompano, Florida, to pick up 58.6 grams of crack cocaine. The conduct also includes defendant's knowing and willing aid to Allen in transporting crack cocaine to the Tallahassee Mall for sale. In return, the defendant expected to receive compensation from Allen.

* * *

Here the defendant's activity demonstrated that he was fully aware of and willingly joined with Allen to distribute 58.6 grams of crack cocaine. This is the

only conduct for which the defendant has been charged.  With regard to this
conduct, the defendant is not a minimal participant.

Furthermore, because the defendant's activity played a material role in the
commission of the offense, he is not a minor participant....[E]ven if defendant's
objections were sustained and his offense level reduced for being a minor or
minimal participant, the defendant's sentence would remain the same, given the
20-year minimum mandatory sentence that is required by statute.

*Id*. at 13-14.

The Court then sentenced Defendant to the minimum mandatory sentence of 240 months

on each count to run concurrently.  *Id*. at 14; *see also* Doc. 82.

Defendant appealed, arguing only "that the district court abused its discretion when it

denied his motion to withdraw his guilty plea."  *United States v. Price*, 139 Fed. Appx. 253, 254

(11th Cir. 2005).  More specifically, Defendant contended:

that he should have been allowed to withdraw his plea because he mistakenly
believed that third-party cooperation would be acceptable in obtaining a sentence
reduction and because his lawyer was unaware of a material government witness
(Ciji Perry) who could contradict the government's case.  For the first time on
appeal, Price also argues that the district court's error in denying his motion was
compounded because Price had "made colorable claims of innocence during his
plea hearing" and the district court never determined if Price was actually
innocent or if he was entering a best interest *Alford*-type plea.

*Id*. at 255.  The court rejected all of these claims, concluding:

Price, and possibly his counsel, mistakenly thought that the government was
allowing another defendant to profit from third-party cooperation and that Price
might profit from it as well.  There is nothing in the plea agreement that Price
signed to indicate that third-party cooperation would be accepted.  Instead, the
agreement clearly states that the determination of whether Price would receive a
substantial assistance reduction was left to the sole discretion of the government.

\* \* \*

Price was not entitled to withdraw his plea agreement because, several months
after his plea, it appeared that the government, in its sole discretion, was not
going to file a substantial assistance motion on his behalf.

Price's motion to withdraw his plea states that his counsel had just become aware of government witness Ciji Perry and that Perry disputed the government's factual proffer that she had loaned Price the car that his co-defendant was driving when the two men were arrested. Price contends that his trial counsel's unawareness of witness Perry's existence means that he did not have close assistance of counsel. That is too much of a stretch.

Even assuming that counsel was unaware of this seemingly unimportant witness because he was negligent in not reviewing the government's witness list, we do not see how that single negligent act could cancel out the close assistance of counsel that he otherwise provided. Throughout the change of plea hearing, Price confirmed that he had consulted his counsel about how to proceed and that he had been "extremely" satisfied with his counsel's representation. One alleged oversight of a relatively immaterial fact is insufficient to entitle Price to withdraw his plea.

*Id*. at 255-56. The court concluded that even if Defendant had raised a colorable claim of innocence as a basis for withdrawing the plea, "he would not have been entitled to do so" since a mere declaration of innocence does not entitle a defendant to withdraw his guilty plea. *Id*. at 256. The court concluded:

A review of the change of plea hearing transcript makes clear that the district court went through Price's rights with him, that Price understood those rights, that Price was satisfied with his counsel, and that–despite any factual disputes–Price persisted in pleading guilty. Price has not demonstrated that his unilateral expectation that third-party cooperation would benefit him or his alleged unawareness of government witness Perry translate into an unknowing or involuntary plea. Accepting the plea agreement may have been a bad decision under the circumstances, but it was a decision that Price knowingly and voluntarily made, after consultation with his counsel and with full understanding of the charges against him and the consequences of his plea. The district court did not abuse its discretion in declining to allow Price to withdraw that plea.

*Id*.

The instant motion to vacate followed. On this occasion, Defendant charges that counsel was ineffective when he failed to investigate Government and defense witnesses which resulted in his having no option but to plead guilty. Doc. 108 at 3. Defendant also claims that counsel was ineffective when he failed adequately to inform Defendant of the ramifications of his plea in

that he led Defendant to believe that a 5K1.1 motion was possible through third-party

cooperation. *Id*. at 7.

As noted previously, the Court held a hearing on Defendant's motion, and what follows

is a summary of each witness' testimony, beginning with Defendant who testified first.

According to Price, from the beginning, he wanted to go to trial, but Mr. Greenberg "didn't feel

like it was a good idea" because of his prior convictions for selling drugs and because "it was

going to be me against the police officers, my cousin and the informant." Doc. 141 at 11. As to

Ciji Perry, Price stated that although he knew Ms. Perry, he had not had seen her during the six

months preceding his arrest because he had been stationed overseas, and therefore, he had not

given counsel Ms. Perry's name as a potential witness on his behalf. *Id*. at 19-20. He also

testified that Mr. Greenberg did not tell him before his change of plea "that the government had

information that [Ms. Perry] was going to claim that she had lent [Defendant] a car so that [he]

could let Mr. Allen use that car to go to South Florida...to buy cocaine[.]" *Id*. at 19. When

counsel told him before sentencing that Mr. Allen had told the investigating officer that

Defendant had arranged to borrow a car from Perry for Allen's use, Price told Mr. Greenberg

that Allen's claim "absolutely was not true[.]" *Id*. at 21. When counsel contacted Ms. Perry,

according to Defendant, she supported Defendant's claim that she had not lent Defendant her

car. *Id*. at 22.

As to the $1400 check which Defendant gave Allen, Price explained that before the plea,

he gave Greenberg the names of witnesses, including Twana Price, Corey Price, Tia Skipper, and

Shandrea Sampson, who would have corroborated his claim that the check represented a

repayment of moneys which Defendant owed Allen, not drug money. *Id*. at 23-24, 26-27.

According to Defendant, Mr. Greenberg never discussed with him the possibility of mounting a defenses of "mere presence" or "withdrawal" or any other defense "besides telling [Defendant] that [he] had to get on the stand and say it wasn't true." *Id*. at 29-30.  Nevertheless, counsel told Defendant "it wasn't a good idea" for him to testify and "if it was him," he would plead guilty. *Id*. at 30-31.  Defendant also testified that he did not know he was facing a 20-year mandatory minimum sentence until "we walked into the courtroom that morning and [Greenberg] informed me he made a mistake about what the sentencing was because they had filed enhanced penalties." *Id*. at 31.  He further stated that Greenberg had told him that if he went to trial and lost, the Government "usually" sought "the maximum penalty which was life in prison." *Id*. at 32.

As to the issue of cooperation, Defendant testified that he did not "know anything firsthand about drug dealing since [his] return from Afghanistan[.]" *Id*. at 34.  He explained that he told counsel that he "probably...wasn't going to get it done on my own," and counsel asked Defendant if someone else could help him. *Id*. at 35.  Defendant advised counsel, "Yeah, I think so," and Mr. Greenberg said he would discuss the issue of third-party cooperation with counsel for the Government. *Id*.  According to Defendant, Mr. Greenberg never told him that third-party cooperation was "not looked upon favorably by the United States Attorney's Office," that it "was only used in rare and unusual situations," or that the "chances of...getting third-party cooperation were pretty slim." *Id*. at 38.  Instead, counsel left Defendant "with the impression that third-party cooperation would be a better option than going to trial and trying to defend the case[.]" *Id*. at 39.  In fact, he and Mr. Greenberg did later meet with Agent Odom "to discuss what the information was that could be provided" and provided him with the name of

Defendant's aunt who was available to help. *Id*. at 41-42. Defendant stated that he had no

further contact with Odom after that date because he "couldn't get in contact with him." *Id*. at

42. Defendant did not know until October 18, when he first appeared for sentencing, that he was

not going to get a substantial assistance motion. *Id*. at 44-45. This was also the day, according

to Defendant, that he first learned about Ciji Perry. *Id*. at 45.

When questioned at the hearing, Petitioner testified that if he had known that there were

witnesses who would have testified about the falsity of Allen's testimony regarding the $1400

check and the car, he "would have told [Mr. Greenberg]...we got to go to trial." *Id*. at 46-48. He

also stated that if he had known that the Government rarely accepted third-party cooperation, he

would not have pled guilty but would have gone to trial because without a substantial assistance

motion, he was "absolutely looking" at a 20-year sentence. *Id*. at 48.

On cross-examination, Defendant acknowledged that early in the case, the Government

had offered him an informant agreement to allow him to cooperate with the Government. *Id*. at

51. He also testified that he "attempted to cooperate," but that "it wasn't successful." *Id*. at 52.

Defendant also agreed that he told Odom he looked in the box containing the cocaine and that

his fingerprint was on one of the bags inside the box because he had touched it. *Id*. at 54.

Throughout questioning, Defendant maintained that he did not know that Allen was delivering

drugs to the CI until they got to the mall. *See, e.g*., *id*. at 57 & 73-75. As to the $1400 check, he

stated that the only reason he had not previously paid Allen back the money he owed him was

because he "was in Afghanistan during those months prior to that." *Id*. at 65-66.

Defendant further testified that Mr. Greenberg did not tell him that it was Defendant's

decision whether to testify; instead, counsel told Defendant that if he went to trial, the "police

officers are going to testify to the statements, Ron Allen was going to testify against me, that Odom was going to testify against me, and then I would have to get up there myself and deny those things." *Id*. at 68-69. Defendant agreed that at the time he actually entered his guilty plea, he knew he was looking at a 20-year sentence absent cooperation. *Id*. at 70.

On re-direct, Defendant explained that at the time he told the Court he was satisfied with Mr. Greenberg's representation, he did not know that Ciji Perry's name had been disclosed to counsel and that she would have impeached Allen's testimony or that he had any witnesses who would have testified on his behalf, as counsel had told him he had no witnesses to call because "they couldn't help." *Id*. at 77.

The next witness to testify was Defendant's aunt, Doryan Chavela Dixon, who testified that she had "numerous" telephone conversations with Greenberg about witnesses in the case. *Id*. at 80-81. According to Ms. Dixon, counsel told her "there were some people that he needed to speak with. But at the end of the case I was informed by him that he had not had an opportunity to or that he had not spoken with any of the witnesses at all, except I think there was one...." *Id*. at 81. Ms. Dixon also testified that she and counsel discussed the issue of third-party cooperation "[b]ecause he informed me that there was third-party cooperation when Lalanda was arrested." *Id*. She stated that she "absolutely" understood from Mr. Greenberg "that that was what was going to be put into effect in this case[.]" *Id*. at 82. According to Ms. Dixon, she did not learn that third-party cooperation was not going to work until later during a telephone conversation with Mr. Greenberg. *Id*. During that same conversation, counsel admitted that he "had neglected to open an e-mail that had been sent to him which was a witness list that he had not opened" and that "the information could have been helpful for Lalanda's case." *Id*. at 83.

According to Ms. Dixon, Mr. Greenberg never told her that third-party cooperation was a "long shot"; instead, she was "under the impression at that time from speaking with him...that those arrangements were already in place." *Id*. at 86-87. She explained: "[I]t was never stated that [Defendant] would be considered. It was stated to me that the third-party cooperation had been done...to arrest Lalanda and, therefore, the same procedures would be taken for Lalanda to defend himself." *Id*. at 88. According to Ms. Dixon, after Mr. Greenberg spoke with counsel for the Government about third-party cooperation, "it was clear...that third-party cooperation was accepted. So that's when the arrangements [for Defendant's uncle to live in Tallahassee] were made." *Id*. at 88-89.

Winston Rudolph, a family friend, testified next. He stated that on the morning of trial, Mr. Greenberg "suggested a plea inasmuch as he had not been able to give full advantage to Lalanda's case" because he "had several cases that did not allow him to give it the level of priority that he wished." *Id*. at 92-93. Mr. Rudolph testified that Mr. Greenberg told Defendant that it would be "advantageous" for him "to go for the plea and to offer whatever cooperation in order to do or perhaps minimize his tenure in the system." *Id*. at 94. He said that Defendant "agreed to try and help himself," but that he insisted "he was not guilty." *Id*. at 96.

The next witness at the hearing was Delfrey Olige, Defendant's uncle. Mr. Olige testified that he became involved after the plea as part of the third-party cooperation attempts. *Id*. at 100. According to Olige, he understood that he was "going to actually do a buy...buy and sell," and he in fact met with Agent Odom. *Id*. at 105-06. Though he made himself available on several different occasions and for various lengths of time, he was not able to complete the cooperation. *Id*. at 107-09. In Mr. Olige's estimation, both law enforcement and Mr. Greenberg

were "giving me the runaround." *Id*. at 109.

He also testified that after the plea, he took Shandrea Nicole Sampson to Mr. Greenberg's office after counsel told him that he could not find her, and he was present when she was interviewed. *Id*. at 101-02. He stated that he had no trouble finding her and that she "wasn't hiding or anything. She'd been going to the same places she'd been going all along." *Id*. at 110. During the interview, Ms. Sampson, according to Mr. Olige, told Mr. Greenberg that the $1400 represented money that Defendant owed Allen. *Id*. at 103-04. However, when counsel "told her that if she contributed [any money to Allen] she could be charged in this case too, like an accessory," she directed Mr. Olige to "take me home...I don't want to talk to nobody no more." *Id*. at 104.

The Government then presented its witnesses, beginning with Richard Greenberg. Mr. Greenberg testified that he has been an attorney since 1983, and that criminal defense work comprises the majority of his practice. *Id*. at 117-18. He also stated that he represents attorneys in bar disciplinary proceedings and applicants seeking admission to the Florida Bar. *Id*. at 118. Counsel acknowledged that he received discovery in this case, reviewed it and the applicable case law, and shared his conclusions regarding the strength of the Government's case with Defendant. *Id*. at 120. As counsel recalled, Defendant "disputed that he was involved in the transaction which led to his arrest and indictment," though "when we got to the point of having to make a decision of whether to go to trial or to plea he decided to take a plea." *Id*.

According to Mr. Greenberg, he interviewed Allen on April 1, 2004. *Id*. at 126. While Allen had previously told law enforcement that Defendant "didn't know about the cocaine or wasn't involved in the cocaine and all of the cocaine was his, his being Mr. Allen," during this

interview, Allen told counsel that Defendant did in fact know that Allen "was selling drugs and that he showed the drugs to Mr. Price and told him that he was taking the drugs to Regina." *Id.* at 127. Allen corroborated Defendant's assertion that "no money was to be paid to Mr. Price," but he claimed that he "showed the drugs to Mr. Price while they were still at the house that same day before they left to go to the mall." *Id.* Allen indicated to counsel that he had given "erroneous information initially in order to protect" Defendant. *Id.* at 128.

Counsel claimed that Defendant never provided him with a written list of witnesses to be interviewed, but he did provide him with the names of Allen, Sampson, Twana Price, and Corey Price. *Id.* at 130-31. Counsel admitted, however, that he did not speak to Sampson until October 4, 2004, several months after the plea. *Id.* at 131. According to Mr. Greenberg, Sampson told him that she gave Allen some money to go to Pompano to visit his children but "when he returned he was supposed to give her the money back but instead he came back with six cookies of cocaine." *Id.* The only mention of Defendant was that "Mr. Allen told Ms. Sampson that the day that Mr. Allen was arrested Mr. Price had given him a ride to the mall." *Id.*

As to Ciji Perry, Mr. Greenberg stated that she told him "she had no relationship with Mr. Price since 2000 or 2001. She was never asked about loaning a car to give to Mr. Price. And she said quote, She doesn't know Mr. Price well enough to loan him a car, closed quote." *Id.* at 132. According to counsel, Twana Price did not provide him with any useful or direct information regarding the events leading to Defendant's arrest. *Id.* at 133.

Regarding cooperation, Mr. Greenberg testified that he believed he spoke with Defendant about the possibility of third-party cooperation before the change of plea; however, he was "not 100 percent certain...." *Id.* at 134. According to counsel, Defendant "was concerned that he may

not know anyone directly that he could work with to try to set up for law enforcement. So that was one of the issues was whether perhaps a third-party could be used because it was our belief that Regina...McFadden had been working to help her boyfriend who was in trouble." *Id*. Counsel stated that the gist of their conversations was "along the lines, if some other person were able to provide information that led to a case with law enforcement with him with the U.S. Attorney's Office that [Mr. Price] could get the benefit of that taking place." *Id*. at 135. He denied making any representation that Defendant would in fact get a substantial assistance motion based on third-party cooperation. *Id*. According to counsel, he "always make[s] it clear that there is no guarantee that [a substantial assistance motion] is going to take place." *Id*. Counsel further denied telling Price or any of his family members that he was not prepared for trial and he claimed that he was in fact "prepared for trial on the morning of trial...." *Id*. at 136-37.

In evaluating the strength of the Government's case against Defendant, Mr. Greenberg considered Allen's testimony to be the most damaging: "I mean, this is Mr. Price's cousin who tells me he's going to get on the witness stand and testify that Mr. Price knew about the cocaine, not just in the car on the way to the Tallahassee Mall, but at the house before they ever left to go to the mall....[I]t's one thing when you have people who just know each other and they're going to give that kind of testimony, but...you have a cousin at trial...." *Id*. at 138. Odom's report was also a consideration, because counsel believed that Defendant "was going to testify that he didn't make all those statements that are attributed to him, but then the problem becomes that when Mr. Price testifies in this trial the jury learns that he's on probation for four counts of sale of cocaine." *Id*. at 138-39.

Returning to the question of cooperation, Mr. Greenberg again testified that it was his recollection that counsel for the Government "told me that [third-party cooperation] was possible, that it could happen," i.e., that it would be considered, but that there was no guarantee of a substantial assistance motion for such cooperation. *id*. at 140.

On cross-examination, Mr. Greenberg testified that "from day one," he knew Price was facing a minimum mandatory 20-year sentence whether he pled guilty or went to trial and was convicted. *Id*. at 142-43. He further stated that he inquired with the Government about the possibility of third-party cooperation on the morning of the plea. *Id*. at 144-45. While he told Price that third-party cooperation and a substantial assistance motion were possible, but not guaranteed, he never advised Defendant that "third-party cooperation by the United States Attorney's Office would only be considered and used by them if the third-party who was trying to do the assistance was dealing with someone known to or having had involvement with the defendant[.]" *Id*. at 146. Indeed, counsel himself was not familiar with that aspect of the Government's criteria for third-party cooperation and did not learn of this criterion until the day of sentencing. *Id*. at 146, 148. In short, because the Government did not tell counsel about this condition on third-party cooperation, he did not tell Defendant about it. *Id*. at 149. Counsel was unsure whether he discussed with Defendant the possibility that he might not be able to cooperate because the State of Florida could revoke his probation. *Id*. at 152.

Mr. Greenberg testified that he never makes a recommendation about whether a client should enter a plea, but he was certain that he told Defendant, "Here's what the evidence is." *Id*. at 153. In counsel's opinion, if Defendant had taken the stand, his prior convictions for selling drugs would have been admissible to show knowledge and intent even though the Government

had not given notice of its intent to use the convictions under Fed. R. Evid. 404(b) and the

convictions were several years old. *Id*. at 154-55. Mr. Greenberg did not deny that Allen was

"certainly impeachable." *Id*. at 157. He also did not deny that before the plea Defendant had

given him the names of witnesses who would testify about the source of the $1400 check to

Allen. *Id*. at 158. As to Ciji Perry, he admitted that he did not learn about her until October,

2004, because "there was an e-mailed witness list [before the plea from counsel for the

Government] that I missed." *Id*. at 159. Apparently, the Government intended to use Ms. Perry

to confirm Allen's statement that "he got a car through Mr. Price to go to South Florida[.]" *Id*.

When Mr. Greenberg interviewed Ms. Perry, however, she refuted Allen's claim she had lent a

car to Defendant. *Id*. at 160. Counsel also agreed that Defendant's explanation for how his

fingerprint got on the bag of cocaine inside the box was plausible and that he was familiar with

the defense of mere presence. *Id*. at 160-61. He also acknowledged that Defendant had refuted

"a great portion" of the DEA-6 of Defendant's interview with Odom and that the interviews are

"never record[ed]." *Id*. at 163.

 As to Ms. Sampson, Mr. Greenberg stated that he did not have "any trouble finding her

once [he] tried to talk to her," and that the interview with her did not occur until October 4, 2004.

*Id*. at 165. He agreed that "the only thing she told [him] about [Defendant] was that Allen

said...Price gave Allen a ride to the mall that day[.]" *Id*. at 166. Counsel had no notes reflecting

that he had Sampson's name until after the plea, and he contended that if he were not prepared

for trial, he "could have moved for a continuance." *Id*. at 166-67.

 Returning to the issue of third-party cooperation, Mr. Greenberg testified that if he had

known "there was an additional restriction" on third-party cooperation that the family member

offering to assist law enforcement "could only deal with someone [Defendant] had dealt with and there wasn't anyone like that," he would not have recommended Defendant plead guilty and "hope for substantial assistance[.]" *Id*. at 169. He then agreed that without knowledge of this restriction on third-party cooperation, Defendant "didn't have all the information available to him when he entered the plea[.]" *Id*. at 169-70. Counsel maintained, however, that his "main hope was that Mr. Price himself would be able to do something" because he had previously cooperated with state law enforcement. *Id*. at 170. Mr. Greenberg further admitted that except for Mr. Allen's testimony, the "most that the government could show, based on what [Defendant] told you" and the information he had, involved "that day at the mall in Tallahassee." *Id*. at 171.

Regarding his interview with Allen, counsel had no notes reflecting whether they "discussed how he traveled [to South Florida] or anything like that," and Mr. Greenberg did not recall whether he discussed the $1400 check with him. *Id*. at 174.

On re-direct, Mr. Greenberg testified that if he had felt there was a reason to move for a continuance of trial, he would have done so, and the court "[m]ost likely" would have granted it.[1] *Id*. at 176. He further stated that because Defendant had given Allen the ride to the mall, not vice versa, "it wasn't...a case of mere presence." *Id*. at 180. Mr. Greenberg also testified that even if he had been given full disclosure of the Government's requirements for third-party cooperation, "there is no way to tell if the criteria is going to be met." *Id*. at 181.

---

[1]If counsel had moved for a continuance, it would have been the third motion for continuance filed by Defendant in this case. The first was requested by original counsel so that Defendant could consider a proffered informant's agreement, and the second was requested by Mr. Greenberg because he need additional time to evaluate the impact of Allen's change of plea. *See* Docs. 21 & 22, 33 & 34.

On re-cross-examination, counsel admitted that because of his schedule the week before Defendant's trial was set, he would not have had time to interview Ciji Perry even if he had seen her name on the witness list. *Id.* at 188.

## DISCUSSION

Because Defendant's claims raise the issue of counsel's effectiveness, a review of *Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy. *Strickland*, 466 U.S. at 686. The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong. *Id.* at 697. The court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice. *Id.; see also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual support for his contentions that counsel's performance was constitutionally deficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). The court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance. *Strickland*, 466 U.S. at 689-90. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted). "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption...that [counsel] did what he should

have done and that he exercised reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions." *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001). "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy." *Chandler*, 218 F.3d at 1315 n.16. "No lawyer can be expected to have considered all of the ways [to provide effective assistance]." *Id*. Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id*. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A

"reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*. Additionally, prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

The two-part *Strickland* test is "applicable to ineffective-assistance claims arising out of the plea process," the only difference being that in the context of a plea, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). "[T]he decision whether to plead guilty (i.e., waive trial) rest[s] with the defendant, and...counsel's advice...might have caused the defendant to forfeit a judicial proceeding to which he was otherwise entitled." *Roe*, 528 U.S. at 485. "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000). This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether a reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001). Thus, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

1.      Failure to investigate witnesses.

In this claim, Defendant charges that the "inaction, error and omission" by Mr. Greenberg to interview Ciji Perry before the plea "severely prejudiced" Defendant because he would have gone to trial if he had known that Ms. Perry would have supported his denial that "he had obtained the Perry car on behalf of Allen and had otherwise made the car available to Allen." Doc. 108 at 3-4. According to Price, because counsel knew that Allen had originally exculpated Defendant from any involvement in this case, he "had an obligation to investigate all listed government witnesses, and he did not." *Id*. at 5. He also claims that if counsel had timely interviewed Ms. Perry and learned the exculpatory nature of her proposed testimony, then he could have "immediately demand[ed] whether the government knew of Perry's statement at the time the government listed Perry as a witness on its witness list," since the Government "would have had an obligation under *Brady* and under Rule 16 discovery procedure to alert trial counsel of this information so that it would have been available to trial counsel in his discussions with the Defendant/Movant relating to entering a plea." *Id*. at 6-7.

Defendant further maintains that he himself gave Mr. Greenberg the names of four witnesses–Shandrea Sampson, Tywana Price, Cory Price, and Tia Skipper–who would have refuted testimony from Allen that Defendant had funded the trip to Pompano Beach to purchase crack. *Id*. In Defendant's view, if Mr. Greenberg had interviewed these witnesses "and obtained this information in a timely fashion, there is no doubt that he...would have realized that the evidence against the Defendant/Movant was weak as to both Allen's claims regarding the Defendant/Movant's involvement in the conspiracy, in obtaining a car for Allen's use in obtaining drugs and providing monies for same." *Id*. at 6.

He concludes that counsel's failure to investigate these witnesses before trial and his advice that Defendant's "only option was to enter a plea in this case and hope to beat a 20-year minimum mandatory sentence through cooperation" constituted ineffective assistance of counsel.

In response, the Government submitted Mr. Greenberg's affidavit. In part, Greenberg states that he met with Allen approximately two weeks after he was retained to represent Price. The date of this meeting, April 1, 2004, was three days after Allen advised the Court that he wanted to change his plea. At that time, Allen advised Greenberg that Price "knew he was selling drugs, that he showed the drugs to Mr. Price that same day before they left to go to the mall, that Mr. Price drove Mr. Allen to the mall to take the drugs to Regina, and that Regina phoned Mr. Price twice while they were driving around the Tallahassee Mall."

As to Ciji Perry, counsel advises that he spoke with Ms. Perry after Defendant pled guilty but before sentencing. Ms. Perry told Greenberg that Allen "would call her looking for Mr. Price, but she had no relationship with Mr. Price since 2000-2001, and did not know how to reach him." She also told Greenberg that "she was never asked" about lending Defendant a car and that she did not "'know Price well enough to loan him a car.'" Counsel concedes that this information "may have impeached...evidence about Mr. Price obtaining a car for Mr. Allen to drive to Pompano to pick up cocaine," but he argues that the statement was not "'exculpatory information' as to what occurred the day Mr. Price drove with Mr. Allen to the Tallahassee Mall."

As to the other witnesses, Mr. Greenberg states that he "do[es] not see the name Tia Skipper anywhere in my notes." He further states that his notes only reflect Corey Price's name, and though he had "numerous conversations" with Twana Price, he had "no notes of any specific

conversations and had no reason to believe she would be a possible defense witness." He admits that he did not speak with Shandrea Sampson until over four months after Defendant's change of plea.

A failure to investigate witnesses is not *per se* deficient performance by an attorney. Instead, counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary....[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "[W]hat investigation decisions are reasonable depends critically" on "information supplied by the defendant." *Id*.

> For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id*.

It cannot be disputed, and indeed, Mr. Greenberg concedes, (1) that the Government sent Ms. Perry's name to him in an e-mailed witness list which he did not open because he was out of town and busy with other matters until immediately before trial was scheduled to begin, and (2) that he did not speak to Perry until after Petitioner had already pled guilty.[2] According to the information gathered by counsel after Price entered his guilty plea, Ms. Perry appears to have been a witness whom the Government was required to divulge under *Brady*, *see United States v.*

---

[2]While the Eleventh Circuit labeled Ms Perry as a "seemingly unimportant witness," the Court does not believe it is bound by that observation, as the issue of counsel's effectiveness was not immediately before the court of appeals at that time.

*Bagley*, 473 U.S. 667, 676 (1985) (impeachment evidence, as well as exculpatory evidence, falls

with *Brady* rule); *see also*, N.D. Fla. Loc. R. 26.3(D)(1) (within 5 days after arraignment or

"promptly after acquiring knowledge thereof," Government shall provide all information and

material known to Government which may be favorable to defendant that is within scope of

*Brady*), as she would have unequivocally impeached Allen's assertion that Price had arranged

Allen's transportation to South Florida to purchase cocaine.  The effect of this testimony would

have been to undermine Allen's credibility further, credibility which was already impeachable

by his prior statements that Defendant was not involved in the drug deal, by the Government's

agreement in his plea and cooperation agreement to "make known [its] opinion as to the nature

and extent of [his] cooperation," Doc. 37, and by Allen's own prior drug record, which placed

him in jeopardy of a minimum mandatory life sentence.   However, because counsel did not even

open the e-mail containing the Government's witness list until some time after he counseled his

client regarding a plea, an oversight he made because he admittedly was too busy with other

matters unrelated to Price's defense, he was not able to discuss the witness list with Defendant,

and it is undisputed that until Ciji Perry's name appeared on the Government's witness list,

neither Defendant nor counsel knew she was a potential witness in this case.  Even a cursory,

perfunctory look at the e-mail would at a minimum have prompted a telephone call to Defendant

to inquire as to his knowledge of Ciji Perry.  What Defendant would have told Greenberg,

according to the undisputed testimony at the evidentiary hearing, was that although he knew

Perry, he had not had contact with her for some time, and thus, even he did not know why the

Government would have placed her on the witness list.  A five-minute follow-up telephone call

to Perry herself would have established her proposed testimony and given counsel a fuller view

of whether his client had viable defenses to the charges or whether a change of plea was in fact the better option for his client. While the Court agrees with counsel that Perry could not shed light on the drug deal itself at the mall on the day in question, it cannot agree that her testimony was of no consequence. At the very least, her testimony undercut the Government's charge of conspiracy in the sense that it created a question as to whether, for example, Defendant was involved, as Allen was prepared to testify, in the planning stages of the alleged conspiracy, and bolstered Price's claim that he did not learn of his cousin's activities until he was already at the mall. Perry's testimony also altered the considerations underlying whether Defendant himself would need to testify. As it was, because Mr. Greenberg was not even aware of the existence of the witness list, and therefore of Ciji Perry's existence, he did not have the information which he needed to determine the best course of action for his client.

As to the other witnesses mentioned in Defendant's motion to vacate, counsel denies any knowledge of Tia Skipper and notes only limited information about Corey Price, namely, that he is Defendant's brother and that Allen had "called him looking for Mr. Price." As to Defendant's wife, Tywanna, counsel acknowledges "numerous conversations with her regarding the case" but states that he has "no notes of any specific conversations and had no reason to believe she would be a possible defense witness." As to Ms. Sampson, Allen's girlfriend, counsel spoke with her on October 4, 2004, shortly before sentencing was scheduled to occur. She told Greenberg that a week before Allen and Defendant were arrested, she had given Allen $250.00. Allen then went to Pompano to visit his children. According to Greenberg, Sampson told him that Allen "was supposed to give her the money back [when he returned], but instead he had purchased six cookies of cocaine" in Pompano. As to Price's involvement, Allen told Sampson only that

Defendant "had given him a ride to the mall the day of the bust."

At the evidentiary hearing, none of these proposed witnesses personally testified, and thus, except for Shandrea Sampson, the Court is left only with what Price "says they would have said." *United States v. Guerra*, 628 F.2d 410 (5th Cir. 1980). However, as to Ms. Sampson, it is clear that counsel had her name before trial and did not contact her until after Price had already pled. While there is no evidence, beyond Price's testimony, that she would have testified about the origins of the $1400 check, there is evidence, both through Defendant's uncle and Mr. Greenberg himself, that if Ms. Sampson had been called to testify, she also would have undercut Allen's testimony about Price's pre-mall involvement in the crimes with which he was charged.

The Court therefore concludes that counsel's failure to open the Government's witness list was not reasonable and no competent counsel would have failed to open the list when it was provided a week before trial was to begin. Counsel's candid acknowledgment that he was too busy with other matters in the week preceding trial--so much so that he had no time to review e-mails from the Government (and apparently had no system in place for a secretary or paralegal to perform the task in his absence)--"indicates that [Mr. Greenberg's] priorities were not rooted firmly with [his] client." *House v. Balkcom*, 725 F.2d 608, (11th Cir. 1984). Counsel knew that Price continued to maintain that he did not know what his cousin was planning until they got to the mall on the day of the bust, but he did not know that the Government had placed a witness in plain sight who would undermine its star witness. The only reason counsel did not know about Ms. Perry was because of his inaction. Furthermore, Defendant himself had divulged at least one witness before trial who also would have supported his claim of innocence. Again, the only reason counsel did not know that she could support Defendant's claim was because counsel failed

timely to interview her.

The question thus becomes whether Defendant suffered any prejudice because of counsel's deficient performance. It cannot be disputed that counsel's advice to Defendant regarding his chances at trial "affected the outcome of the plea process." *Hill*, 474 U.S. at 58-59. While the Court does not believe that Defendant's decision to plead guilty rested with anyone other than himself, it does find that Greenberg's advice, which was predicated on incomplete information caused by his inaction, not Defendant's, caused Price to "forfeit a judicial proceeding to which he was otherwise entitled." *Roe*, 528 U.S. at 485. Price was unequivocal and credible in stating that if he had known that Ciji Perry was a proposed Government witness and that she would have impeached the Government's star witness against him, he would not have pled guilty and would have insisted on going to trial, which is sufficient to establish prejudice under *Hill*. Because Mr. Greenberg did not have all of the information which he needed to counsel Defendant regarding the efficacy of a plea and Defendant accepted his attorney's estimation of his chances at trial when he otherwise would have gone to trial as he intended, Defendant's right to effective assistance of counsel was violated. Given the facts and circumstances of this case, the Court does not believe that Defendant's expression of satisfaction with Greenberg's services can be held against him since, at the time, he did not have any reason to suspect that his attorney had not acted properly or had not given him reasonably competent advice in counseling him.

        2.        Third-party cooperation.

There is no dispute that, barring some illegality on his part, the decision whether to seek a downward departure for cooperation lies exclusively with the United States Attorney. Therefore,

even if Defendant had cooperated with the Government or had arranged for third-party

cooperation through one of his relatives, he was still not guaranteed that the Government would

file a substantial assistance motion.  The Court made that very clear to Defendant at the time of

his plea.

However, the question is whether counsel acted deficiently in suggesting to Defendant

that third-party cooperation might be a viable avenue towards consideration of substantial

assistance when he himself did not know the full contours of the Government's policies

regarding this type of cooperation, particularly its requirement that to even be considered, the

third party must be able to connect with someone who has had dealings with the instant

Defendant.  At the time Mr. Greenberg discussed third-party cooperation with Defendant, he

knew Price took the position that he could not personally act as an informant because he no

longer knew people who were in the drug business.  Indeed, Defendant had apparently already

had discussions with the Government in that regard, and the agents had not been able to develop

any viable contacts through Defendant during the time of his pretrial release.  If Defendant could

not personally provide the Government with any viable leads on drug activity because he was no

longer active in the business, then the possibility of third-party cooperation which necessarily

hinged on making contact with Defendant's drug associates was doomed from the beginning,

and therefore counsel's suggestion of third-party cooperation was not reasonable.  From the

testimony produced at the evidentiary hearing, Mr. Greenberg only asked Government counsel

whether third-party cooperation was ever considered by the Government.  Counsel, who did not

testify herself, apparently told him that it is considered, but she did not volunteer the rest of the

criteria for successful third-party cooperation, and there is no evidence that counsel asked her for

the particulars. For counsel even to suggest the possibility of third-party cooperation when he did not know the requirements for such cooperation was not reasonable under the circumstances.

The question becomes once more whether Defendant was prejudiced by counsel's lack of knowledge regarding third-party cooperation, and again, the Court must conclude that even though counsel may have made it clear to Defendant that he was not guaranteed a substantial assistance motion, he did not make it clear to Price that the chance of securing a substantial assistance motion in this case were non-existent because of the Government's requirements for successful third-party cooperation. Defendant based his decision in part on counsel's representation that third-party cooperation was a possibility. If Price had known that because of the Government's requirements there was no chance for successful third-party cooperation, muchless a guarantee of successful cooperation, then, according to him, he would not have pled guilty. Indeed, given the fact that there was no chance that the Government was even going to consider moving for a downward departure, he achieved nothing by pleading guilty.

Price was therefore deprived of the effective assistance of counsel in this regard as well.

## CONCLUSION

Having carefully considered the matter, including the testimony and evidence produced at the evidentiary hearing, the Court finds that counsel acted in contravention of *Strickland* and its progeny, and that Defendant was deprived of the effective assistance of counsel. He should therefore be afforded the opportunity to withdraw his guilty pleas to both charges in this case.

Accordingly, it is respectfully **RECOMMENDED** that Defendant's motion to vacate, Doc. 108, be **GRANTED**; that Defendant be allowed to **WITHDRAW** his guilty pleas; and that trial be set on the charges in the Indictment.

**IN CHAMBERS** at Gainesville, Florida, this *28ᵗʰ* day of July, 2009.


*s/ A. KORNBLUM*
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**